## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

MICHELE FERRY QUINN,  :
                          :
           Plaintiff     :    No. 3:15-CV-1343
                          :
       vs.            :    (Judge Nealon)
                          :
CAROLYN W. COLVIN, Acting   :
Commissioner of Social Security,  :
                          :
       Defendant   :

*FILED*
*SCRANTON*
*NOV 3 0 2016*
PER _____
DEPUTY CLERK

## MEMORANDUM

On July 8, 2015, Plaintiff, Michele Ferry Quinn, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and XVI of the Social Security Act,42 U.S.C. § 1461 et seq. and 42 U.S.C. § 1381 et seq., respectively. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] her application for DIB on October 22, 2012, and her application for SSI on October 31, 2012, alleging disability beginning on June 21, 2011, due to a combination of Bipolar Disorder, Manic Depression, anxiety, and a back injury. (Tr. 45, 232).[4]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on February 13, 2013. (Tr. 45). On March 25, 2013, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 45).  An oral hearing was held on March 11, 2014, before administrative law judge Edward Brady, ("ALJ"), at which Plaintiff and an impartial vocational expert, Gerald W. Keating, ("VE"), testified.  (Tr. 45).  On April 10, 2014, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff was capable of performing full range of light work. (Tr. 51).

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on September 10, 2015. (Doc. 10).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

On May 22, 2014, Plaintiff filed a request for review with the Appeals
Council. (Tr. 35). On May 14, 2015, the Appeals Council concluded that there
was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus,
the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on July 8, 2015. (Doc. 1). On
September 10, 2015, Defendant filed an answer and transcript from the SSA
proceedings. (Docs. 9 and 10). Plaintiff filed a brief in support of her complaint
on January 7, 2016. (Doc. 16). Defendant filed a brief in opposition on March 28,
2016. (Doc. 26). Plaintiff filed a reply brief on April 11, 2016. (Doc. 27).

Plaintiff was born in the United States on September 3, 1970, and at all
times relevant to this matter was considered a "an individual closely approaching
advanced age."[6] (Tr. 215). Plaintiff obtained her GED, and can communicate in
English. (Tr. 231, 233). Her employment records indicate that she previously
worked as an assistant for a beauty supplies business and a casino, a hostess and
server for several restaurants, a salesperson for cosmetics, and a tool manager for a
military supplier. (Tr. 203). The records of the SSA reveal that Plaintiff had

---

6. "Person closely approaching advanced age. If you are closely approaching
advanced age (age 50-54), we will consider that your age along with a severe
impairment(s) and limited work experience may seriously affect your ability to
adjust to other work." 20 C.F.R. 404.1563(d).

earnings in the years 1987, 1993 through 2000, 2002 through 2008, and 2010 through 2011. (191). Her annual earnings range from a low of zero dollars in 1988-1992, 2001, and 2009 to a high of fifteen thousand seven hundred forty dollars and twenty-six cents ($15,740.26) in 2008. (Tr. 191). Her total earnings during those twenty-four (24) years were one hundred sixteen thousand nine hundred fifty-two dollars and twenty-eight cents ($116,952.28). (Tr. 191).

In a document entitled "Function Report - Adult" filed with the SSA on September 29, 2012, Plaintiff indicated that she lived in an apartment with friends. (Tr. 221). When asked to describe how her illnesses, injuries or conditions limited her ability to work, Plaintiff stated she had difficulty associating and socializing with others, was unable to go out alone, had a hard time getting out of bed, cooking, and cleaning, and was depressed "all the time." (Tr. 221). From the time she woke up to the time she went to bed, Plaintiff would sleep in late, wake up and make a sandwich, and then go back to bed, where she would either sleep or watch television. (Tr. 222). She was able to make sandwiches, prepare frozen food, and cook "simple meals weekly;" do laundry for two (2) hours once a week; dust and clean all day once a month; and shop for "meals" in stores. (Tr. 223-224). She was not able to drive a car because she had an expired license. (Tr. 224). She was able to walk for fifteen (15) to twenty (20)

minutes before needing to rest for "not very long at all." (Tr. 226).  When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did <u>not</u> check lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, seeing, understanding, or using hands. (Tr. 226).

Regarding her concentration and memory, Plaintiff needed special reminders to take care of her personal needs, take her medicine, and attend appointments. (Tr. 223, 225).  She could count change, use a checkbook, and pay bills, but could not handle a savings account because she had a "hard time saving money." (Tr. 224).  She could pay attention for "not long at all," she did not follow written or spoken instructions well, and she was not able to finish what she started. (Tr. 226).  She did not handle stress or changes in routine well. (Tr. 227).

Socially, Plaintiff did not spend time with others, but rather stayed home most days aside from a once monthly appointment with her psychiatrist and a visit to her mother. (Tr. 225).  Her hobbies included watching television daily. (Tr. 225).  In response to the question regarding whether she had problems getting along with family, friends, neighbors, or others, Plaintiff responded, "[t]hey annoy the hell outta me.  They try to tell me what to do." (Tr. 226).  When asked how she got along with authority figures, she responded, "not very good." (Tr. 227).

Plaintiff also filled out a Supplemental Function Questionnaires for pain.

5

(Tr. 229-230).   Plaintiff stated that she had pain located in her "left butt cheek [that went] down [her] left leg." (Tr. 229).  Her pain was aggravated by standing for a long time, bending, and walking, and only occurred when she had "done a lot of walking, standing, or bending." (Tr. 229).  The pain would last for a few hours until she could lie down.  (Tr. 229).  Plaintiff took Advil to help with the pain. (Tr. 230).

At her hearing on March 11, 2014, Plaintiff testified that she was disabled due to Bipolar Disorder, and agreed that her back pain was not an impairment that rendered her disabled, leading the ALJ to focus solely on her mental health impairment as an alleged cause for disability.  (Tr. 95-96).  Plaintiff reported that she attended counseling "usually every two months or a month." (Tr. 98).  She indicated that she was taking Seroquel, Wellbutrin, and Lithium at the time of her hearing, and that her medication doses were overly sedating and made her overly hungry, which resulted in weight gain.  (Tr. 98-99).  She stated that her mental health impairment caused her to become very angry, very quickly "over actually stupid stuff." (Tr. 100).  She had good days during which she would be manic, and bad days during which she would not want to get out of bed.  (Tr. 101). However, she stated that her medication had helped "level [her] out." (Tr. 101). She testified that she experienced manic episodes during which she would engage

in risky behavior, and that her last manic phase occurred in October of 2013. (Tr. 104-105). However, the majority of the time, she was in a depressive phase. (Tr. 106). She stated that about two (2) to three (3) days a week, she could not get out of bed and/ or had to force herself to get out of bed because she could not "deal with people" and did not want to talk to or see anyone. (Tr. 106). She stated that, if she made it to the couch on a given day, "that's a winner for the day." (Tr. 106). She testified that in terms of social relationships, she would visit her mother who lived five (5) minutes away and talked to her best friend every day. (Tr. 107). She also conveyed a story of how she ended up having suicidal ideations of cutting herself intentionally with a box cutter at work after being told by her son's father that her son would not be able to visit her. (Tr. 111-112). She stated this was the incident that led to her first hospitalization, her inability to return to work, and her applications for disability. (Tr. 112-115).

## MEDICAL RECORDS

On June 20, 2011, Plaintiff presented to Wilkes-Barre General Hospital after experiencing suicidal thoughts at work. (Tr. 259). More specifically, Plaintiff "was having a bad day at work and had the urge to slit her wrists." (Tr. 259). Her intake physical examination revealed that she had a normal affect, was oriented to person, place, and time, was tearful, and was cooperative. (Tr. 260).

7

She was transferred and admitted to First Hospital Wyoming Valley for further evaluation because of her self-reported suicidal ideations. (Tr. 260). Upon arrival at First Hospital of Wyoming Valley, Plaintiff reported that she had a depressed mood, anxiety, and feelings of agitation. (Tr. 268). Her mental status examination revealed she was alert and oriented, had an anxious and depressed mood, was experiencing suicidal ideas, was cooperative, and had impulse control problems. (Tr. 271). She was discharged on June 23, 2011 with a diagnosis of Bipolar Disorder as she "had done well with remission of her presenting problem [and her] mood, thinking, and behavior were stable with no suicidal ideas, impulsivity, or problems with medication." (Tr. 268-269, 272). Her summary of treatment noted that Plaintiff was prescribed Lithium and Seroquel "for preoccupation, anxiety, impulsivity, mood stabilization, an decreased sleep." (Tr. 268). Plaintiff agreed to attend outpatient treatment at Community Counseling Services, and her prognosis was listed as "fair to good." (Tr. 269).

On July 6, 2011, Plaintiff had an appointment at Community Counseling Services of NEPA ("CCS"). (Tr. 282). Her mental status examination noted that she had a blunt affect, a depressed mood, and intact intelligence and judgment. (Tr. 282). She was instructed to continue taking Seroquel and several other medications. (Tr. 283).

8

On July 22, 2011, Plaintiff had an appointment at CCS. (Tr. 285). It was noted that Plaintiff felt very aggressive, and her mother, who attended the appointment with her, stated that Plaintiff had not been doing well. (Tr. 285). Plaintiff had been compliant with her medications, and it was noted that she did not experience side effects. (Tr. 285). It was also noted that Plaintiff reported her energy was low and that she was sleeping too much. (Tr. 285). Her mental status examination revealed she was cooperative, had clear and appropriate speech, had a bright affect, had a euthymic mood, was negative for racing thoughts, paranoia, and hallucinations, had intact memory and intelligence, and had fair insight and judgment. (Tr. 285). Plaintiff was instructed to discontinue Seroquel, and was prescribed Abilify, Celexa, and Lithium. (Tr. 285). She was scheduled for a follow-up in two (2) weeks. (Tr. 285).

On August 3, 2011, Plaintiff had an appointment at CCS. (Tr. 286). Plaintiff reported that she had been feeling much better, that she was able to do more during the day, and that she was not experiencing suicidal or homicidal ideations. (Tr. 286). It was noted that she was compliant with her medications, that she had not been experiencing side effects, and that her sleep and appetite were good. (Tr. 286). Her mental status examination revealed that she had speech within normal limits, had a full affect, had a normal mood, had no hallucinations,

9

had organized thought content, and had fair memory, intelligence, insight, and judgment. (Tr. 286). She was instructed to continue taking her medications and to return for a follow-up in four (4) weeks. (Tr. 286).

On August 31, 2011, Plaintiff had another appointment at CCS. (Tr. 284). It was noted that Plaintiff was compliant with her medications with no side effects, had dreams about hurting her manager, had anxiety about going back to work, and felt like sleeping most of the day. (Tr. 284). Her mental status examination noted that she had homicidal ideations, had well-organized speech, had a bright affect, was slightly depressed, had average memory and intelligence, and had good judgment and insight. (Tr. 284). Plaintiff was prescribed Paxil and was instructed to follow-up in four (4) weeks. (Tr. 284).

On November 12, 2011, Plaintiff had an appointment with Gary Batok, M.D. for what she believed was a Lithium overdose. (Tr. 305). Her medications at that visit were listed as Abilify, Lithium, and Paxil. (Tr. 306). Her examination revealed that she was alert and well developed. (Tr. 307). She underwent blood work, was discharged, and was instructed to follow-up with her psychiatrist in two (2) days. (Tr. 308).

On February 9, 2012, Plaintiff underwent a psychological evaluation performed by Sara Cornell, Psy.D. (Tr. 320). Plaintiff's self-reported symptoms

10

included: sadness; crying; lethargy; anhedonia; avolition; negative thinking; low self-esteem; feelings of inadequacy, discouragement, helplessness, worthlessness, and hopelessness; excessive sleeping; poor hygiene; lack of social contact with others; mood swings between depression and anger; a history of verbal and physical abuse to others when angry; short-term memory loss; difficulty with long-term memory; and panic attacks that involved a racing heart, shortness of breath, dizziness, sweating, and shaking. (Tr. 320). Her mental status examination revealed: fair hygiene; a flat affect and dysphoric mood; spontaneous, clear, coherent, and logical speech of appropriate volume; relevant and goal-directed thought processes; fair attention and concentration; poor interaction; no judgment or insight into difficulties; average intellect; poor eye contact; poor social skills; no hallucinations, delusions, or bizarre behavior; and an inability to perform tests of counting and seriation. (Tr. 320-321). Her Axis I diagnosis was Bipolar I Disorder and her GAF was a thirty (30). (Tr. 321-322). Her prognosis was listed as poor, and it was recommended that Plaintiff continue with medication and therapy. (Tr. 322). Dr. Cornell opined that Plaintiff had: (1) marked restrictions in her ability to make judgments on simple work-related decisions, to interact appropriately with supervisors and co-workers, and to respond appropriately to work pressures in a usual work setting and a routine work setting; (2) moderate

restrictions in her ability to carry out short and simple instructions, to understand, remember, and carry out detailed instructions, and to interact appropriately with the public; and (3) slight restriction in her ability to understand and remember short, simple instructions. (Tr. 317-318).

From January 23, 2012 through November 20, 2012, Plaintiff had monthly appointments with CCS. (Tr. 330-343). Plaintiff reported she was depressed, not sleeping, secluded herself, had decreased motivation and interests, did not take care of herself, stayed in bed all day, and had decreased energy. (Tr. 330-343). Her mental status examinations revealed she had poor hygiene, clear speech, a depressed mood and flat affect, clear thought content, an intact memory, fair to poor insight and judgment, average intellectual functioning, and racing thoughts. (Tr. 330-343). Her diagnosis remained unchanged as Bipolar II Disorder. (Tr. 330-343).

On January 15, 2013, Plaintiff had an appointment at CCS. (Tr. 445). She reported that she had been very depressed, but was not sleeping all day anymore, and denied having anxiety and mood swings. (Tr. 445). Her mental status examination revealed she: had a depressed mood and flat affect; had intact memory; had poor insight and judgment; had below average intellectual functioning; and had linear and quiet speech. (Tr. 445). Plaintiff was prescribed

12

Trazadone. (Tr. 446).

On January 22, 2013, Plaintiff underwent a consultative examination performed by Jay Willner, M.D. (Tr. 353). Plaintiff reported that she was depressed, slept excessively, had no motivation to do anything, could not get out of bed, was antisocial, was manic, and had been experiencing anxiety. (Tr. 353-354). She stated shew as able to do household chores, including sweeping, mopping, vacuuming, cooking, doing the dishes, and shopping, for short intervals of time. (Tr. 354-355). Her medications at that appointment included Paxil, Seroquel, and Albuterol. (Tr. 355). Her physical examination revealed Plaintiff: was well-developed and in no acute distress; could walk without difficulty; could get on and off of the examination table and up and out of her chair without difficulty; had grossly intact hearing; had one hundred percent (100%) understandable speech; had a 5/5 grip bilaterally; had full range of motion throughout her spine, hips, knees, and ankles; could walk on her heels and toes; was able to squat and walk in tandem; had good personal hygiene; was able to follow simple directions; and had intact cranial nerves. (Tr. 356-357). The impression was that Plaintiff had Bipolar Disorder, Manic Depression, anxiety, and a back injury. (Tr. 357).

On January 24, 2013, Plaintiff underwent a consultative examination

performed by Jeffrey Fremont, Ph.D. (Tr. 362). It was noted that Plaintiff's hygiene was "questionable," but her gait and manners were appropriate. (Tr. 362). Her mental status examination revealed that she: was alert; had intact cognitions; had poor hygiene; had reasonably good eye contact; had a "certain edge" to her voice; had speech within normal limits; had a depressed and anxious mood; reported feeling helpless and having difficulty accomplishing anything; had an angry and flat affect; had continuity of ideas; had no difficulty with language; had content of thought free of preoccupation or thought disturbance; had good abstract thinking and fund of information; had below average basic math skills; had intact remote, recent past, and recent memory; had poor social and test judgment; had fair to poor insight; and appeared to be reliable in her statements. (Tr. 363-364). Her Axis I diagnosis was Bipolar Disorder and her GAF was fifty-five (55). (Tr. 364). Her prognosis was guarded but favorable with psychotherapy and medication. (Tr. 365). It was also noted that Plaintiff shopped if accompanied, cooked "quite extensively," cleaned her house rarely, watched television all day, did not read, needed appointment reminders, paid her bills, and socialized with friends. (Tr. 365). Dr. Fremont opined Plaintiff had fair ability to: follow work rules; relate to coworkers; deal with the public; use judgment; interact with supervisors; deal with work stress; function independently; maintain attention and

concentration; maintain personal appearance; behave in an emotionally stable manner; relate predictably to social situations; and demonstrate reliability. (Tr. 365). He also opined that she had poor ability to understand, remember, and carry out complex and detailed job instructions, but that she had good ability to understand, remember, and carry out simple job instructions. (Tr. 365).

On Feburary 6, 2013, Grant Croyle, Ph.D., completed a Psychiatric Review Technique. (Tr. 129). He opined that, for Listings 12.04 and 12.09, Plaintiff had moderate restriction in activities of daily living; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (Tr. 129). Dr. Croyle also completed a Mental Residual Functional Capacity Assessment form, in which he opined that Plaintiff was moderately limited in her ability to carry out very short and simple instructions; to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain ordinary routine without special supervision; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number

and length of rest periods; to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from others; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (Tr. 132-134).

On February 11, 2013, Catherine Smith, M.D., completed a Physical Residual Functional Capacity Assessment form. (Tr. 145-146). She opined that Plaintiff could never climb ladders, ropes, or scaffolds; had no exertional, manipulative, visual, or communicative limitations; and should avoid concentrated exposure to hazards such as machinery and heights. (Tr. 145-146).

On February 13, 2013, Plaintiff had an appointment at CCS. (Tr. 443). Plaintiff reported that she felt "really good," that the increased dosage of her medication had been helping "a lot," that she had trouble staying asleep, that she had good energy during the day, that her appetite decreased, and that she had mood swings. (Tr. 443). Her mental status examination revealed she: had a depressed mood and stable affect; had intact memory; had intact insight and judgment; had below average intellectual functioning; and had clear and relevant speech. (Tr. 443).

On April 12, 2013, Plaintiff had an appointment at CCS. (Tr. 439).

Plaintiff reported that she "felt okay." (Tr. 439).   Her mental status examination revealed she: had a euthymic mood and affect; had a memory within normal limits; had good insight; had intact judgment; and had clear and relevant speech. (Tr. 439). Plaintiff was instructed to increase the dosage of Trazadone. (Tr. 440).

On May 10, 2013, Plaintiff had an appointment at CCS. (Tr. 437).  Plaintiff reported that she had been very depressed, was sleeping excessively, had no motivation to do anything, was irritable, had low energy, and had weight gain. (Tr. 437).  Her mental status examination revealed she: had a euthymic mood and neutral affect; had intact memory; had good insight and judgment; and had clear and relevant speech. (Tr. 437).  Plaintiff was instructed to discontinue Trazadone, to start Wellbutrin, and to continue taking Paxil, Tegreton, and Seroquel. (Tr. 438).

On May 23, 2013, Plaintiff was admitted to First Hospital Wyoming Valley by Dr. Joseph Szustak due to homicidal thoughts, more specifically of wanting to kill her boyfriend. (Tr. 381).  Her mental status examination upon admission revealed she: appeared angry and upset; was cooperative and with good disclosure; denied having hallucinations, delusions, or paranoid thinking; had intact reality testing; had no difficulties intellectually or with orientation or memory; had impaired insight and judgment; and had fair hygiene and appropriate

17

attire. (Tr. 388). She had an Axis I diagnosis of Bipolar Disorder and a GAF of twenty (20) to twenty-five (25) upon admission. (Tr. 388). The plan was to continue Plaintiff on her medication regime, including Paxil, Tegretol, Seroquel, and Wellbutrin. (Tr. 388). During her psychiatric admission, Plaintiff reported that she felt really sad, could not sleep, had racing thoughts, and had thoughts of harming her boyfriend. (Tr. 392). A second mental status examination revealed she: was alert; had good hygiene; had limited insight and judgment; and was oriented in three (3) spheres. (Tr. 394). A third mental status examination revealed she: was alert; had fair hygiene; had an animated affect and pleasant mood; had intact memory; had adequate reality testing; and had limited insight and judgment. (Tr. 397). A fourth mental status examination revealed she: was alert; had fair hygiene; had a subdued mood and affect; had intact memory; had adequate reality testing; and had limited insight and judgment. (Tr. 398). A fifth mental status examination revealed she: was alert; had satisfactory hygiene; had intact memory; and had fair reality testing, judgment, and insight. (Tr. 399). A sixth mental status examination revealed she: was alert; had fair hygiene; had an appropriate mood and affect; had an intact memory and reality testing; and had limited judgment and insight. (Tr. 400). A seventh mental status examination revealed she: was alert; had good hygiene; had an appropriate mood and affect;

had intact memory and reality testing; and had limited judgment and insight. (Tr. 403). A final mental status examination during Plaintiff hospitalization revealed she: was alert, had good hygiene; had an appropriate mood and affect; had an intact memory and reality testing; and had adequate insight and judgment. (Tr. 406). Plaintiff was discharged on May 30, 2013 because her "problems adequately resolved in the hospital setting." (Tr. 381). Her mental status examination at discharge revealed she: was alert, had good hygiene; had an appropriate mood and affect; had intact memory; had no intellectual limitations; had adequate reality testing; had adequate insight and judgment; and had no hallucinations, delusions, or suicidal or homicidal ideations. (Tr. 381).

On August 8, 2013, Plaintiff had an appointment at CCS. (Tr. 424). Plaintiff noted that she had mood swings, poor sleep, depression, anxiety, and a poor appetite. (Tr. 429). Her mental status examination revealed she: had a depressed mood and full affect; had relevant thought content; had intact recent and remote memory; had poor insight and judgment; had average intellectual functioning; and had coherent speech. (Tr. 429). She was instructed to continue taking Tegretol, and Wellbutrin, and to restart Seroquel and Paxil. (Tr. 430).

On October 14, 2013, Plaintiff had an appointment at CCS. (Tr. 426). Plaintiff reported she had increased irritability, fair sleep, anxiety, depression, and

racing thoughts. (Tr. 426). Her mental status examination revealed she: had a euthymic mood and full affect; had relevant thought content; had intact recent and remote memory; had poor insight and judgment; had average intellectual functioning; and had coherent speech. (Tr. 426). She was instructed to continue taking Seroquel, Tegretol, and Wellbutrin, but to discontinue Paxil. (Tr. 427).

On October 24, 2013, Plaintiff had an appointment at CCS. (Tr. 424). Plaintiff noted she woke up in a bad mood and drank all day to make herself feel better. (Tr. 424). It was also noted that she appeared to be very frustrated and upset. (Tr. 424). Her mental status examination revealed she: had a dysthymic mood and full affect; had relevant thought content; had intact recent and remote memory; had poor insight and judgment; had average intellectual functioning; and had pressured speech. (Tr. 424). She was instructed to continue taking Seroquel, Tegretol, and Wellbutrin. (Tr. 425).

On November 12, 2013, Plaintiff had an appointment at CCS. (Tr. 422). It was noted that Plaintiff stated she was "not doing that bad." (Tr. 422). The treatment notes also stated that she complained of aggression and anger, had racing thoughts, and had difficulty sleeping. (Tr. 422). Her mental status examination revealed she: had a clean/ neat appearance; had an appropriate motor activity; had a euthymic and full mood and affect; had relevant thought content;

20

had intact recent and remote memory; had poor insight and judgment; had

coherent speech at a normal rate; and had average intellectual functioning. (Tr.

422). She was instructed to continue taking Seroquel, Tegretol, and Wellbutrin.

(Tr. 423).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner. See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld. 42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988) (quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340

U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07. Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work. For purposes of the preceding

sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg.

24

34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2014. (Tr. 47). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of June 21, 2011. (Tr. 47).

At step two, the ALJ determined that Plaintiff suffered from the severe[7] combination of impairments of the following: "bipolar disorder, major depressive disorder, anxiety, back sprain, and asthma (404.1520(c)) and 416.920(c))." (Tr. 47).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 48-50).

At step four, the ALJ determined that Plaintiff had the RFC to perform a full range of light work with limitations. (Tr. 51-55). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). [Plaintiff] can

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

perform the full range of light work with lifting/ carrying of 10
pounds frequently and up to 20 pounds occasionally. She can
stand/ walk 6 hours and sit for 2 hours in an 8-hour workday.
She is further limited to no more than simple, routine, and
repetitive tasks, i.e. work generally described as unskilled, with
no public interaction and only occasional interaction with co-
workers and supervisors.

(Tr. 51).

At step five of the sequential evaluation process, because Plaintiff could not

perform any past relevant work, and considering the her age, education, work

experience, and RFC, the ALJ determined "there are jobs that exist in significant

numbers in the national economy that the [Plaintiff] can perform (20 C.F.R.

404.1569 and 404.1569(a))." (Tr. 55-56).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between June 21, 2011, the alleged onset

date, and the date of the ALJ's decision. (Tr. 56-57).

## DISCUSSION

On appeal, Plaintiff asserts that the ALJ erred in the weight he afforded to

the medical opinions, which resulted in a flawed RFC determination because the

consultative examiners whose opinions were given the greatest weight did not take

into account medical evidence that arose after the rendering of these opinions or

Plaintiff's self-reported symptoms. (Doc. 11, pp. 7-13) . Defendant disputes this

contention.  (Doc. 26, pp. 13-22).

The responsibility for deciding a claimant's RFC rests with the administrative law judge.  See 20 C.F.R. § 404.1546.  In arriving at the RFC, an administrative law judge should be mindful that the preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits.  See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time."  Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason."  Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical

28

evidence of record.

Pursuant to Social Security Regulation 96-6p, an administrative law judge may only assign less weight to a treating source opinion based on a non-treating, non-examining medical opinion in "appropriate circumstances." SSR 96-6p, 1996 SSR LEXIS 3. This regulation does not define "appropriate circumstances," but gives an example that "appropriate circumstances" exist when a non-treating, non-examining source had a chance to review "a complete case record . . . which provides more detailed and comprehensive information than what was available to the individual's treating source." Id. (emphasis added). The Third Circuit has not upheld any instance, in any precedential opinion, in which an administrative law judge has assigned less than controlling weight to an opinion rendered by a treating physician and more weight to an opinion from a non-treating, non-examining examiner who did not review a complete case record. See Brown v. Astrue, 649 F.3d 193 (3d Cir. 2011) (holding that the administrative law judge did not err in affording more weight to a medical opinion rendered by a non-examining physician because the physician testified at the oral hearing and had a chance to review the entire case record); Brownawell v. Commissioner of Social Security, 554 F.3d 352 (3d Cir. 2008) (holding that three (3) non-treating opinions were not sufficient to reject a treating source medical opinion because they were

"perfunctory' and omitted significant objective findings promulgated after the non-treating opinions were issued); Morales, 225 F.3d at 314 (holding that remand was proper because the claimant's residual functional capacity was based on an opinion rendered by a non-treating, non-examining physician who "review[ed] [claimant's] medical record which . . . did not include [two physicians'] reports" and was thus based on an incomplete medical record).

Additionally, in choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence. Morales, 225 F.3d at 316-18. An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

Regardless of what the weight an administrative law judge affords to medical opinions, the administrative law judge has the duty to adequately explain the evidence that he or she rejects or affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

In the case at hand, the ALJ gave no weight to the opinion of examining physician Dr. Cornell because it was "inconsistent with the longitudinal record, including Dr. Freemont's examination that is more recent, the other benign mental examinations of record, and her routine, conservative treatment." (Tr. 54). Instead, the ALJ gave great weight to the opinions of Dr. Croyle and Dr. Fremont, both of whom were non-examining, consultative examiners, because the ALJ found these opinions to be consistent with the longitudinal record. (Tr. 54).

In accordance with this aforementioned binding Third Circuit precedent that has been reiterated in a significant amount of cases, this Court finds issue with the ALJ's reliance on two (2) opinions that were rendered by non-examining, consultative examiners in February 2013, before Plaintiff's May 2013 week-long psychiatric hospitalization and biweekly to monthly therapy appointments at CCS occurred. (Tr. 380-446). The Third Circuit and subsequent cases from the Middle

31

District of Pennsylvania have repeatedly held that, especially in an instance in which a condition worsens, an administrative law judge errs in relying solely on opinions issued by non-treating, non-examining physicians who have not reviewed a complete case record.

As such, upon review of the entire record and the ALJ's RFC determination, it is determined that the ALJ improperly afforded significant weight to the opinions of the non-treating, non-examining physicians, Dr. Croyle and Dr. Fremont, in determining Plaintiff's mental health RFC because these opinions were rendered before substantial evidence of record occurred that showed a worsening of Plaintiff's mental health impairment.  Surely, a week-long psychiatric hospitalization indicates a worsening of a condition, as do the treatment notes from numerous therapy appointments at Community Counseling Services of NEPA that indicated Plaintiff's condition was worsening.  Regardless, an administrative law judge's RFC determination is not supported by substantial evidence when significant medical findings and events occur after the rendering of opinions that were solely relied on by the ALJ in determining Plaintiff's mental RFC.  Therefore, remand on this basis is necessary, and this Court declines to address Plaintiff's remaining assertions.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.


**Date:** November 30, 2016

/s/ **William J. Nealon**
**United States District Judge**

33